FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### CASE NO.:

2013 SEP 18  PM 12: 06

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA, FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JENIFER E. HOFFMAN, JOHN C. BOSCHERT, | ) |
| and BRYAN T. ZUZGA, | ) |
| | ) |
| | ) |
| Defendants. | ) |

5:13 -Cv - 455-oc-10PRL

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges:

## INTRODUCTION

1. The Commission brings this action to enjoin Jenifer E. Hoffman and John C. Boschert, the former principals of Assured Capital Consultants, LLC, and Assured Capital's purported escrow agent, Bryan T. Zuzga, from further violations of the anti-fraud provisions of the federal securities laws.

2. Between approximately January and September 2009, Assured Capital, through Hoffman, Boschert, and Zuzga, raised at least $25 million from investors through a fraudulent prime bank offering scheme.

3. Hoffman and Boschert represented to investors that their money would be invested in an offshore trading program managed by a confidential trade platform which, in turn, would invest in blocks of medium term notes.

4. To entice investors, Hoffman and Boschert boasted of exorbitant profits, claiming the investment would provide weekly returns of up to 50%, that the investment program had

already yielded returns to investors, and that investors would receive 100% of their investment within the first four payouts.

5.    They lured investors further with the illusion of safety, describing the investment as performing, established, safe, reliable, and/or guaranteed.  Moreover, Hoffman, Boschert, and Zuzga represented to investors their money would remain safe in Assured Capital's escrow account controlled by Zuzga, a licensed attorney and the company's escrow agent.

6.    None of these representations was true.  The investment program was a fiction and the promised returns a ruse.  In addition, Zuzga was not Assured Capital's escrow agent.  In fact, Zuzga was never a licensed attorney.

7.    In reality, Assured Capital, through Hoffman and Boschert, operated a Ponzi scheme, using investor funds to make payments to other investors.  Also, Hoffman, Boschert, and Zuzga misappropriated investor funds, using investor money for their personal use.

8.    As a result of the conduct described in this Complaint, the Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5.  Unless restrained and enjoined, they are reasonably likely to continue to violate the federal securities laws.

9.    Accordingly, the Commission respectfully requests that the Court enter: (a) a permanent injunction restraining and enjoining the Defendants from violating the federal securities laws; (b) an order directing the Defendants to pay disgorgement with prejudgment interest; and (c) an order directing the Defendants to pay civil money penalties.

## DEFENDANTS AND RELATED ENTITY

### Defendants

10.    Jenifer E. Hoffman, 36, resides in Clermont, Florida, and was the managing member of Assured Capital.

11.    John C. Boschert, 41, resides in Apopka, Florida and was a member of Assured Capital.

12.    Bryan T. Zuzga, 37, resided in Clermont, Florida during the relevant period and now resides in Coldwater, Michigan.

### Related Entity

13.    Assured Capital Consultants, LLC was a Florida limited liability company incorporated in September 2008, with its principal place of business in Clermont, Florida. The State of Florida administratively dissolved Assured Capital in September 2010 for failing to file its annual report with the state.

### JURISDICTION AND VENUE

14.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

15.    This Court has personal jurisdiction over the Defendants, and venue is proper in the Middle District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in this District.  For example, Hoffman and Boschert met with investors in this District, and Zuzga spoke with investors by phone while he was living in this District.

16.   In addition, Assured Capital's principal place of business was in this District, Hoffman and Boschert reside in this District, and Zuzga resided in this District during the period of the fraud alleged in the Complaint.

17.   The Defendants, directly or indirectly, singly or in concert with others, have made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the conduct alleged in this Complaint.

## THE DEFENDANTS' FRAUDULENT INVESTMENT SCHEME

### Background

18.   Between approximately January and September 2009, Assured Capital, through Hoffman, Boschert, and Zuzga, raised at least $25 million from investors through a private offering of securities.

19.   Hoffman, Boschert, and Zuzga all had direct communications with prospective investors regarding the Assured Capital investment opportunity.  Hoffman and Boschert had joint access to Assured Capital's email account, which they used to communicate with investors.

20.   Investors entered into various forms of agreements with Assured Capital generally designated as "joint venture business agreements," "joint venture revenue share agreements," or in at least one instance, a "business co-operation agreement" (collectively referred to as "joint venture agreements").  In connection with the joint venture agreements, investors also entered into escrow agreements, signed by Zuzga as Assured Capital's escrow agent.

## Purported Overseas Trading Program

21.  After learning of Assured Capital, typically by word of mouth, investors met with Hoffman and Boschert, usually in person.

22.  During their initial meetings with investors, Hoffman represented herself as the managing member of Assured Capital. Both Hoffman and Boschert stated they were partners in the company. Boschert stated they wanted to expand Assured Capital's investment program. He represented he had the international "connections," and his contact was the person performing the actual trades for Assured Capital. He also claimed he monitored the basic parts of the trades.

23.  Hoffman and Boschert told investors their money would be placed into an escrow account that served to secure a line of credit. This line of credit would then be used to invest in a "confidential trade platform" which, in turn, would invest in medium term notes in blocks of trades and trading contracts from overseas banks. The confidential trade platform was purportedly an offshore operation based in Europe and/or Panama.

24.  Investors believed their funds would be pooled for the purpose of trading bank instruments and that the profits from these transactions would be shared among investors and Assured Capital. Investors were dependent upon the efforts and expertise of Hoffman, Boschert, and the purported overseas trader for their returns. Investors' returns were derived solely from the entrepreneurial or managerial efforts of Hoffman, Boschert, and the purported overseas trader. Investors had no control over how and from whom the medium notes would be purchased or sold. Nor did they participate in the management of the trading program from which their returns were to be generated.

25.  According to Hoffman and Boschert, the money would never leave the escrow account, and because the credit line was the basis for the trades, the money in Assured Capital's

escrow account was never at risk.   Zuzga represented that investors' money would remain in the escrow account until the funds were returned.

26.   Hoffman and Boschert told investors, that Zuzga, a "licensed attorney," controlled the escrow account.   Zuzga provided a veneer of legitimacy to the scheme as a purported licensed attorney and Assured Capital's escrow agent.

27.   Hoffman and Boschert also explained to investors the transactions would take about a week to ten days to complete.   Based on Hoffman and Boschert's representations, as well as representations in the joint venture agreements, investors understood that if they wanted their money back, they needed only to wait ten days.

### Assured Capital's Joint Venture and Escrow Agreements

28.   In connection with their investments, investors entered into joint venture and tandem escrow agreements.   Some of the joint agreements provided that Hoffman and Boschert were authorized to sign on behalf of Assured Capital, while others stated Hoffman was entering into the agreement on behalf of Assured Capital.   Zuzga reviewed the agreements.

29.   The various versions of the joint venture agreements generally made representations as to an escrow account into which the investor funds would be deposited, referenced a tandem escrow agreement to be entered into, described how the proceeds from the investment program would be allocated, and often specified the investment returns or so-called "program options."

30.   Typically, the joint venture agreements represented that Assured Capital would be placing the investor's money for investment purposes with a "performing private placement investment opportunity" being managed by a "confidential trade platform."

31.   According to these agreements, Assured Capital was engaged in "professional, financial services" for and on behalf of the investor, including introducing investors' capital into this "performing" trade platform.   Typically, the joint venture agreements stated Assured Capital

6

would provide: (1) a platform through which to conduct the business of the agreement; (2) full control to deposit funds related to the business of the agreement; (3) management of the business of the agreement; and (4) monitoring activity related to the underlying business of the agreement.

32. Different versions of the joint venture agreements provided for varying investment returns or "program options." For example, one version provided for program options of 45% returns per week. The agreement stated the investor's money would be placed in escrow under the terms of an attached escrow agreement and "will remain under the control of the escrow agent at all times and is to be used as a proof of funds only. [Assured Capital] acknowledges funds are not at risk."

33. Another version stated that program options were currently 25% to 45% per week and highlighted that **"100%-200% PER MONTH IS ANTICIPATED AND PRINCIPLE (SIC) CAN BE TAKEN AT ANY TIME WITH A 10 BUSINESS DAY NOTICE, INTEREST AMOUNT IS BASED ON THE PRINCIPLE INVESTED WITH[ ]THE COMPANY."** (bold, capitalization and underlining in original).

34. With respect to Assured Capital's compensation, the joint venture agreements stated the company would be compensated by sharing in the revenues or trade yields that the investment generated. Some versions claimed Assured Capital and the investor would split weekly "payouts" evenly, while other versions provided for a split that was slightly higher in favor of the investor.

35. In addition to the joint venture agreements, investors were required to enter into various versions of an escrow agreement with a purported Florida company called Bryan T. Zuzga PA, represented by Bryan T. Zuzga Esq.

36. The escrow agreements generally provided that the investor had agreed to use Assured Capital's escrow account, for which Zuzga claimed to be sole signatory, for the

transactions related to the purported overseas trading program.  Zuzga signed the agreements as Assured Capital's escrow agent.  They listed the bank information and account number for the purported escrow account that would be used to receive and distribute investor funds.

37.    This main bank account was the one into which investors deposited their funds and from which Ponzi payments, disguised as investor proceeds, were disbursed to investors.  This account exhibited no signs of a traditional escrow account.  For example, funds were constantly deposited into and then transferred out of the account and disbursed to various accounts, including those of the investors and several accounts affiliated with the Defendants.  There were also multiple cash withdrawals.

38.    Boschert and Hoffman accessed and used Assured Capital's email account to provide investors the wiring instructions to this main bank account and to confirm receipt of the funds.

## MATERIAL MISREPRESENTATIONS AND OMMISSIONS

39.    In connection with Assured Capital's offering, Hoffman, Boschert, and Zuzga made material misrepresentations and omissions about: (a) the existence and true nature of the investment program; (b) the safety of the investment; (c) Zuzga's role in the fraud and Defendants' representations; and (d) the status of investor funds.

### The Existence and True Nature of the Investment Program

40.    Hoffman and Boschert, made blatantly false and misleading statements and omissions to Assured Capital's investors both orally and in writing.  For example, Hoffman and Boschert told investors Assured Capital was investing their money in an overseas medium term notes program that was already established.  According to Hoffman and Boschert, and as represented in the joint venture agreements, investors would receive weekly payouts of 25% to 50%.

8

41.   In addition, they told at least one investor that Assured Capital's trading program was earning profits for investors and that the investor's money would be part of a $500 million "block" of trades.   Specifically, they explained that Assured Capital already controlled more than $100 million of that block and was now expanding an already-performing program.   Hoffman claimed she was already obtaining "profits on profits" because of the ongoing block of which she was buying more.

42.   Hoffman and Boschert's representations were false.   The medium term notes program did not exist.   Investor money was not used to invest in any block of trades.   In fact, there was no "block" at all.   Moreover, there were no profits; the returns investors received were actually Ponzi payments.

### The Safety of the Investment

43.   Hoffman and Boschert further explained Assured Capital would make weekly payouts to investors, whose principal investments would be returned to them within the first four payouts.

44.   Hoffman and Boschert also represented to investors that the investment was safe, reliable, established and performing and told at least one investor that the 40-50% weekly returns were guaranteed.   Hoffman told another investor the investment was so safe, because it was already established and performing.

45.   None of these representations was true.   Assured Capital made no legitimate investments on behalf of its investors.   Thus, there was no reasonable basis to represent that the investment was established, performing, reliable, or safe.   Nor was there a reasonable basis to represent that investors would receive returns ranging from 25% to 50% per week.

9

## Zuzga's Role in the Fraud and the Defendants' Representations

46. Additionally, Hoffman and Boschert claimed Zuzga was the sole signatory on the escrow account. They represented to investors that because investor money never left this account, the funds would never be at risk. At least one investor was shown bank documents reflecting an escrow account under Zuzga's control.

47. Zuzga confirmed to investors Hoffman and Boschert's representation that he was a licensed attorney and would be acting as Assured Capital's escrow agent. Zuzga also confirmed he had been the company's escrow agent since January 2009 and had been making regular distributions on a weekly basis to investors. Moreover, Zuzga represented that investors' money would remain in the escrow account until the funds were returned to them.

48. Zuzga's purported credentials in which investors took comfort were a sham. While Zuzga might have had a law degree, he was not licensed to practice law in any state or jurisdiction. Further, Zuzga's purported law firm, Bryan T. Zuzga PA, did not exist.

49. Moreover, Zuzga was never Assured Capital's escrow agent. In fact, Assured Capital had no escrow agent. Instead, Hoffman and Boschert were the only signatories on Assured Capital's bank accounts.

## The Status of Investor Funds

50. Assured Capital would typically make Ponzi payments to investors for a few weeks. Satisfied with what they thought were high returns and the apparent success of the program, some investors then made additional investments.

51. Once Assured Capital stopped the payments, however, Hoffman and Boschert fraudulently lulled investors, offering excuses and assurances, and blaming bank-related delays or snafus.

52.   For example, Hoffman explained to an investor that the bank had closed Assured Capital's escrow account because it did not like all the international transactions.  She told him Assured Capital was transferring its money to another bank and showed him a fake receipt for a $26 million deposit into a new bank.

53.   Another investor met with Boschert and Hoffman, both of whom urged him to keep his money with Assured Capital.  Hoffman showed the investor a phony bank statement confirming that Assured Capital had $32 million in a bank account.

54.   To further the charade, Hoffman provided investors with sham verification letters, which Zuzga notarized, confirming that Assured Capital had up to $500 million at a Panamian bank.  The bank, however, did not exist.

55.   Ultimately, investors received a letter from Assured Capital stating that due to circumstances beyond its control, the company was terminating all joint venture agreements.

## COUNT I

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a) of the Securities Act

56.   The Commission repeats and realleges paragraphs 1 through 55 of this Complaint as if fully restated herein.

57.   Between approximately January and September 2009, the Defendants, directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, as described in this Complaint, have: (a) knowingly, willfully or recklessly employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

58.   By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(l), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (a)(2), and (a)(3)].

## COUNT II

### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

59.   The Commission repeats and realleges paragraphs 1 through 55 of its Complaint, as if fully restated herein.

60.   Between approximately January and September 2009, the Defendants, directly or indirectly, by use of any means or instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

61.   By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that the Defendants have committed the violations of the federal securities laws alleged herein.

### II.

### Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(1), (2), and (3) of the Securities Act and Section 10(b) and Rule 10b-5(b)(a), (b), and (c) of the Exchange Act.

### III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### IV.

### Penalties

Issue an Order directing all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

13

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 18, 2013

Respectfully submitted,

By: _____

Russell Koonin
Senior Trial Counsel
Florida Bar No. 474479
Telelphone: (305) 982-6385
E-mail: KooninR@sec.gov

Trisha D. Sindler
Senior Counsel
Florida Bar No. 773492
Telephone: (305) 982-6352
E-mail: FuchsT@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

14